COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-06-217-CV

 

 

IN THE MATTER
OF THE GUARDIANSHIP 

OF VIRGIE LOUISE PARKER, 

AN ALLEGED INCAPACITATED
PERSON

 

                                              ------------

 

               FROM PROBATE
COURT NO. 1 OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

I. 
Introduction








In four issues, Appellant, the attorney ad litem
for Virgie Louise Parker, asserts that the trial court erred by admitting at
trial two physician=s reports and argues that the
evidence presented at trial was legally and factually insufficient to support
the jury=s
findings that Parker was incapacitated, that it was in her interest for a
guardian to be appointed, and that her rights would be protected by such an
appointment.  We will affirm.

II. History

A. 
Background and Documentation

On August 22, 2005, Tanika East, an Adult
Protection Services caseworker, went to the home of Parker, age 74, after a
report of alleged physical harm.  Parker
was living alone at a home previously owned by her deceased husband.  Parker=s house
was locked, and Parker refused to allow East to enter her home.  East observed the outside of Parker=s home
to be in a state of disrepair; the yard was cluttered with debris, including
three junk vans, and makeshift plywood was up against the house; a dog shed was
in the front yard with a dog inside; and there was a tent in the yard where
Parker was reported to be living.  In
addition, East observed that Parker was wearing dirty clothes, her hands were
dirty, her hair was not clean, and she appeared to have been digging in the
dirt.  During her investigation, East
spoke with Parker=s neighbors and received reports
that Parker was living in the backyard and roaming the neighborhood collecting
trash.








After the visit, East determined that Parker was
at risk for physical neglect and that she should be removed from her home, so
East initiated a guardianship proceeding based upon her observations and her
conversations with Parker and Parker=s
neighbors.  On August 25, 2005, East
returned and observed Parker in the same physical appearance as the first time
that she saw her.  During East=s visits
to Parker=s home, Parker did not wish to
speak with East and refused to provide any information during either of her
visits.  East took pictures of Parker=s
physical condition, as well as the appearance of the outside of the home.  These photos of the home were introduced at
trial and are in the record, verifying that extremely cluttered conditions
existed at the home.  If anything, the
pictures show that East=s descriptions were understating
the conditions found at the home.  Adult
Protective Services then removed Parker from her home and placed her in a
nursing facility at Park View Care Center (APark
View@) in
Fort Worth.  After the two August
meetings with Parker, East had no further contact with Parker until her trial
in February 2006.  East testified that
she had investigated over one hundred cases and that she had filed only two or
three cases reporting the need for guardianship, of which this case was one.








Park View offered medical records into evidence
under the ANotice of Filing of Records
Accompanied by Affidavit Under Rule 902(10).@  These records contained numerous notes by the
physicians, nurses, and caseworkers as to Parker=s
condition.  Documentation from her stay
at Park View was extensive and included the following partial
assessments/diagnoses:  several Adiagnosis
of Dementia and or Alzheimers disease@;
multiple assessments that Parker Arequires
continued facility level of care on a daily inpatient basis@; and
several assessments of Adepression . . . unable to care
for herself . . . constant one-to-one assistance . . . confused and disoriented
. . . episodes of disorientation or forgetfulness requiring staff intervention
one to six times per week.@  According to one Aprogress
report,@ Parker
stated to the nurse, AI don=t go to
the doctors or have a regular doctor because of lack of money,@ and she
Arefused
to sign her admission . . . and to give any information for her social history
. . . [and] feels as if she is being held prisoner.@  According to another Aprogress
report,@ Parker
goes on to 

allege to her Dr. that we are keeping [her] here
at [Park View] against her will.  Dr.
attempted to explain to [Parker] that [she] currently has a temporary Guardian
through the State. [Parker] remains very upset and told Dr. that all of the
nurses at [Park View] lied on the paperwork that was presented to the judge.
[Parker] alleged to Dr. that [Park View] is destroying her finances and giving
[a] bad report on her.








The nursing facility history and physical form
taken on September 2, 2005, and signed by Dr. Adolphus Ray Lewis, D.O. had
boxes checked for delusion, agitation, chronic obstructive pulmonary disease (ACOPD@),
depression, Alzheimer=s, or Alzh/dementia, with
Aricept being mentioned as one of the medications ordered.  On September 30, 2005, Parker=s
Aricept medication increased from five milligrams to ten milligrams, as it was
determined that the maximum dose would be beneficial, and the drug Nameda was
added to the regimen on September 30, 2005. 
Progress notes on December 12, 2005, reflected that Parker was
disoriented, had delusions, and was still being treated for depression and
dementia and COPD.  On the progress notes
dated August 26, 2005, it stated that Apatient
answers all quest[ion]s but cannot process well.@  It also stated that A[patient]
responded to some questions with short answers in covering up pt-c early
dementia and psyche eval[ation].@  The nurses= notes
contained examples of Parker=s
requiring daily intervention by the staff and having to be reminded of meal
times.

A Physician=s
Certificate of Medical Exam was prepared, and Dr. Lewis, signed the report
after the evaluation of Parker.  Filed in
the trial court on August 29, 2005, Dr. Lewis=s
Physician=s Certification of Medical Exam
(AReport
No. One@) found
Parker to be totally incapacitated.  The
report stated that Parker A[was]
unable to make decisions and care for herself . . . . Assessment revealed early
dementia.@








On August 30, 2005, the guardian ad litem for
Parker, Kelcie Hibbs, filed an AApplication
for Appointment of Any Suitable Person as Temporary and Permanent Guardian of
the Person@ for Parker.  On August 31, 2005, Parker filed her original
answer contesting the guardianship proceedings filed against her.

On September 7, 2005, Parker=s
attorney ad litem requested an independent medical examination.  On September 19, the court signed an agreed
order, ordered the exam, and appointed Dr. Edward A. Luke, Jr. to conduct the
exam.  The court then appointed the Texas
Department of Aging and Disability Services as temporary guardian of Parker
pending her contest of the permanent guardianship.  On October 12, 2005, Dr. Luke met
with Parker for approximately thirty minutes to an hour, reviewed the medical
chart, and interviewed her nurse at Park View. 
After examining Parker, Dr. Luke determined that she was totally
incapacitated.  On November 22, 2005, Dr.
Luke completed his report (AReport
No. Two@) and
filed it with the court on November 29, 2005. 
Dr. Luke stated in his report the following:

Parker=s remote memory is
impaired.  She believes she was remarried
to her ex-husband.  Her recent memory is
also impaired.  She does not accurately
remember the recent events concerning what had happened at the house where she
lived, nor what had transpired when she was admitted at the Parkview Care Center.  She can not remember what her current
medications were and when she referred to a note book she was still not able to
give an accurate list.

 

 








B.  Trial
Testimony

Dominica Ihegboro, a guardianship specialist,
served as the representative for Texas Department of Aging and Disability
Services as the temporary guardian of the person of Parker.  Ihegboro testified that, in her visits with
Parker, Parker was unable to care for herself, make decisions, and meet her
daily needs; Parker=s house was unlivable and not
hooked up to facilities; and Parker was unable of making the appropriate
housing arrangements for herself.  Parker
was unable to manage her finances to rectify her home situation and was unable
to go to the store to buy food and prepare it. 
Ihegboro also testifed that Parker=s doctor
had indicated that Parker had not been receiving enough nutrition.  Parker exhibited memory problems and was
taking Namenda, Nematine, and memory medication for her dementia, although
Parker had not cooperated or provided information to her doctors and did not
remember what medications she was taking.








Parker testified that the pictures taken by East
were of her, the outside of her van, and her property.  Parker said that she had previously been
cited by Code Enforcement for the condition of the house.  She further testified that she walked or rode
the bus because she could not afford to drive a car and had not driven since
probably 2005.  Nevertheless, Parker then
testified that after she got back home, she was going to get Athat
nice old van they took a picture of out[,] and I=m going
to drive it.@ 
She also stated that she had not written a check in at least two
years.  Parker testified that she did not
think she needed to be taking any kind of medication but was not clear about
how many times a day she took her medications. 
Parker=s plan for where she would live
if released from Park View was to live with a friend, but she did not have any
idea of the amount of the rent.  Parker
also could not answer questions about how much her groceries cost a month or
how much she would spend.  Parker also
stated that Dr. Luke changed his report from a partial incapacitation block to
total.  Dr. Luke=s
Certificate of Medical Exam had no cross-outs or strike-overs, and Parker
refused to believe it.

Barbara Carrington, a friend of Parker=s,
testified that prior to visiting Parker in the nursing home in August 2005, the
last time she went to Parker=s home
was in 2004.  Carrington testified that
the last time she saw Parker=s
residence in 2004, it was kind of dark, and she did not know whether or not
there was clutter in the yard.  Unaware
that Parker had been diagnosed with dementia, Carrington testified, in her
opinion, that Parker did not need any type of medication. 








After a trial on the merits, the jury found that
Parker was an incapacitated person. 
Furthermore, the jury found that it was in the best interest of Parker
to have the trial court appoint a guardian, and that she would be protected by
such an appointment.  Parker filed a
motion for new trial, which was overruled. 
This appeal followed.

III.  The
Physician=s Reports

In her first issue, Parker argues that the
reports of Dr. Adolphus Lewis and Dr. Edward Luke were inadmissible and should
not have been admitted at trial under Texas Rule of Evidence 803(6).  

A. 
Standard of Review

An appellate court must examine a probate court=s
appointment of a guardian, as well as the challenges to the admission or
exclusion of evidence, for an abuse of discretion.  Nat=l Liab.
& Fire Ins. Co. v. Allen, 15 S.W.3d 525, 527-28 (Tex.
2000); Trimble v. Tex. Dep=t of
Prot. & Reg. Serv., 981 S.W.2d 211, 217 (Tex. App.CHouston
[14th Dist.] 1998, no pet.).








To determine whether a trial court abused its
discretion, we must decide whether the trial court acted without reference to
any guiding rules or principles; in other words, we must decide whether the act
was arbitrary or unreasonable.  Downer
v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985), cert.
denied, 476 U.S. 1159 (1986).  Merely
because a trial court may decide a matter within its discretion in a different
manner than an appellate court would in a similar circumstance does not
demonstrate that an abuse of discretion has occurred.  Id.

An abuse of discretion does not occur where the
trial court bases its decisions on conflicting evidence.  In re Barber, 982 S.W.2d 364, 366
(Tex. 1998) (orig. proceeding). 
Furthermore, an abuse of discretion does not occur as long as some
evidence of substantive and probative character exists to support the trial
court=s
decision.  Butnaru v. Ford Motor Co.,
84 S.W.3d 198, 211 (Tex. 2002).

B. 
Analysis

Texas Rule of Evidence 803(6) reads as follows:

The following are not
excluded by the hearsay rule, even though the declarant is available as a
witness.

 

. . . .

 








A memorandum, report,
record, or data compilation, in any form, of acts, events, conditions,
opinions, or diagnoses, made at or near the time by, or from information
transmitted by, a person with knowledge, if kept in the course of a regularly
conducted business activity, and if it was the regular practice of that
business activity to make the memorandum, report, record, or data compilation,
all as shown by the testimony of the custodian or other qualified witness, or
by affidavit that complies with Rule 902(10), unless the source of information
or the method or circumstances of preparation indicate lack of trustworthiness.

 

Tex. R. Evid. 803(6) (emphasis
added).  








Parker asserts that the physician=s
reports from Dr. Luke and Dr. Lewis should not have been admitted under the
business records exception to the hearsay rule because the reports were not
made, she argues, in the regular practice of their business and cites as
authority Texas Employer=s
Insurance Ass=n v. Sauceda, 636
S.W.2d 494 (Tex. App.CSan Antonio 1982, no writ), and Freeman
v. American Motorists Insurance Co., 53 S.W.3d 710 (Tex. App.CHouston
[1st Dist.] 2001, no pet.).  These cases
are distinguishable.  In Sauceda,
wherein Frutoso Sauceda sued under a worker=s
compensation claim, TEIA, the carrier, offered a one page letter Areport@ from a
physician without supporting documents that appeared to be made in response to
a request from TEIA concerning Acritical
issues surrounding the instant controversy.@  Sauceda, 636 S.W.2d at 498.  The court questioned the trustworthiness
of the document, which is the foundation of the business records exception,[2]
because on its face it appears to have been elicited by an outside interested
source, and further, was sent four months after the last examination of the
patient was made.  

In Freeman, wherein Stanley Freeman sued
AMIC under a worker=s compensation claim, the
document in question was a one-page letter from Dr. Sajadi to Freeman=s
attorney, apparently without supporting documentation.  Referring to the reasoning in Sauceda,
the court noted that the letter was written ten years after the cause of action
accrued and 

a mere 10 days before the
summary judgment hearing.  This time
frame indicates a lack of trustworthiness.  In the absence of Dr. Sajadi=s remaining records, it
appears that he wrote the letter solely in response to a request from Freeman=s attorney . . . [and] is
an attempt to convey an opinion which has been elicited by an outside
interested source.

 

Freeman, 53 S.W.3d at 715 (emphasis supplied).  Both documents from the two cases were found
to be inadmissible by the appellate courts, who focused on the trustworthiness
of the documents solicited by a party with a pecuniary interest in the outcome
of the case.








In the case before the court, the reports in
question were prepared by Dr. Lewis on August 26, 2005, and by Dr. Luke on
November 22, 2005, with an undated addendum attached to Dr. Luke=s report
based on the same examination as his report. 
The affadivits accompanying the reports tracked the language of Rule
803(6) indicating that it was the regular course of business to make the
reports.  These reports were not
requested by an interested party having a pecuniary interest in the case, as in
Freeman and Sauceda, and in fact, Dr. Luke=s
examination and subsequent report and addendum were the result of an agreed
order dated September 19, 2005, and signed by Parker=s
attorney.  Under these circumstances, we
cannot say that there is a question about trustworthiness, which is the basis
for the business reports exception, and hold that the trial court, under the
appropriate standard of review, did not abuse its discretion by admitting the
reports.  We also observe, as will be
discussed in the legal and factual sufficiency review that follows, that much
of the information contained in the report is also contained in the records
from Park View=s records, which were properly
admitted into evidence.  We overrule
Parker=s first
issue.

IV.  Legal
and Factual Sufficiency

In her final three issues, Parker asserts that
the evidence is legally and factually insufficient to support the jury=s
findings that Parker was incapacitated, that it was in her interest for a
guardian to be appointed, and that her rights will be protected by such an
appointment.








The jury answered certain questions in the court=s charge
that had as the measure proof or a clear and convincing evidence standard
(incapacity, best interest for appointment of guardian, protected by
appointment of guardian).    Clear and convincing evidence is that measure
or degree of proof that will produce in the mind of the trier of fact a firm
belief or conviction as to the truth of the allegations sought to be
established.  Tex. Civ. Prac. & Rem. Code Ann. '
41.001(2) (Vernon Supp. 2006); Tex. Fam.
Code Ann. ' 101.007 (Vernon 2002); Transp.
Ins. Co. v. Moriel, 879 S.W.2d 10, 31 (Tex. 1994).  This intermediate standard falls between the
preponderance standard of civil proceedings and the reasonable doubt standard
of criminal proceedings.  In re G.M.,
596 S.W.2d 846, 847 (Tex. 1980); State v. Addington, 588 S.W.2d 569, 570
(Tex. 1979).  While the proof must weigh
heavier than merely the greater weight of the credible evidence, there is no
requirement that the evidence be unequivocal or undisputed.  Addington, 588 S.W.2d at 570.








This higher burden of proof elevates the
appellate standard of legal sufficiency review. 
Diamond Shamrock Ref. Co. v. Hall, 168 S.W.3d 164, 170 (Tex.
2005); Sw. Bell Tel. Co. v. Garza, 164 S.W.3d 607, 622, 625 (Tex.
2004).  In reviewing the evidence for
legal sufficiency, we must determine whether the evidence is such that a
factfinder could reasonably form a firm belief or conviction that its finding
was true.  Hall, 168 S.W.3d at
170; Garza, 164 S.W.3d at 627.  We
must review all the evidence in the light most favorable to the finding.  Hall, 168 S.W.3d at 170; Garza,
164 S.W.3d at 627.  This means that we
must assume that the factfinder resolved any disputed facts in favor of its
finding if a reasonable factfinder could have done so.  Hall, 168 S.W.3d at 170; Garza,
164 S.W.3d at 627.  We must also
disregard all evidence that a reasonable factfinder could have
disbelieved.  Hall, 168 S.W.3d at
170; Garza, 164 S.W.3d at 627.  We
must consider, however, undisputed evidence even if it is contrary to the
finding.  City of Keller v. Wilson,
168 S.W.3d 802, 817 (Tex. 2005); Hall, 168 S.W.3d at 170.  That is, we must consider evidence favorable
to the finding if a reasonable factfinder could, and disregard evidence
contrary to the finding unless a reasonable factfinder could not.  Wilson, 168 S.W.3d at 827.








This higher burden of proof also elevates the
appellate standard of factual sufficiency review.  In re C.H., 89 S.W.3d 17, 25 (Tex.
2002).  On appeal, we cannot view a finding
that must be based on clear and convincing evidence the same as one that may be
sustained on a mere preponderance.  Id.  In considering whether the evidence rises to
the level of being clear and convincing, we must determine whether, on the
entire record, a factfinder could reasonably form a firm conviction or belief
that its finding was true.  Id. at
28.

The distinction between legal and factual
sufficiency lies in how we review the evidence. 
In reJ.F.C., 96 S.W.3d 256, 266 (Tex. 2002).  In a factual sufficiency review, in
determining whether the evidence is such that a factfinder could reasonably
form a firm belief or conviction that its finding was true, we must consider
whether disputed evidence is such that a reasonable factfinder could not have
resolved it in favor of the finding.  Id.  If, in light of the entire record, the
disputed evidence that a reasonable factfinder could not have credited in favor
of the finding is so significant that a factfinder could not reasonably have
formed a firm belief or conviction in the truth of its finding, then the
evidence is factually insufficient.  Id.  If we reverse on factual sufficiency grounds,
then we must detail in our opinion why we have concluded that a reasonable
factfinder could not have credited disputed evidence in favor of its finding.  Id. at 266-67.








Based on the appropriate standard of review, and
the evidence recounted herein, we hold that the evidence presented at trial was
such that the jury could reasonably form a firm belief or conviction that
Parker was an incapacitated person, that it was in her best interest to have a
guardian appointed, and that she would be protected by such an appointment, and
therefore hold that the jury=s
verdict on these issues was supported by legally and factually sufficient
evidence.  We overrule Parker=s
second, third, and fourth issues.

V. 
Conclusion

Having overruled Parker=s four
issues, we affirm the judgment of the trial court.

 

BOB
MCCOY

JUSTICE

 

PANEL A:   HOLMAN,
GARDNER, and MCCOY, JJ.

 

DELIVERED: November 29,
2007











[1]See Tex. R. App. P. 47.4.





[2]AThis exception rests upon
a circumstantial guarantee of trustworthiness . . . .@  Id.